**SIGNED THIS: February 22, 2019**

_____

**Thomas L. Perkins**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **BRADLEY STEVENS,** | ) | Case No.  17-80635 |
| | ) | |
| Debtor. | ) | |
| ─────────────────────── | ) | |
| | ) | |
| **CHAT Ltd.,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No.  17-8054 |
| | ) | |
| **BRADLEY STEVENS,** | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OF DECISION**</u>

This matter is before the Court for decision, after trial, on the six-count Complaint filed

by CHAT Ltd., objecting both to the dischargeability of the debt owed by Bradley Stevens, the

Debtor, and to the Debtor's right to receive a discharge.  CHAT seeks a determination that the

Debtor's discharge be denied pursuant to sections 727(a)(2), (a)(3) and (a)(4), or in the
alternative, that its debt be determined nondischargeable pursuant to sections 523(a)(2)(B), (a)(4)
and (a)(6). The bankruptcy case and this adversary proceeding reflect, in large part, the
continuation of a prepetition dispute between two business partners, Bradley Stevens and Jerry
Lewis. While the history of their relationship and their falling out is not directly at issue in this
adversary proceeding, it provides helpful context to this litigation and has assisted the Court in
reaching a decision that is fundamentally fair and consistent with the applicable provisions of
sections 727 and 523 and the policies underlying those provisions.

**Factual Background**

According to the Debtor, his bankruptcy filing was triggered by collection activity,
including a wage garnishment, initiated by CHAT. The relationship between the Debtor and
Jerry Lewis, the President and owner of CHAT, has been long-standing and complex, arising out
of their relationship as members of two limited liability companies, A Team Mining, LLC and
RFA Holdings, LLC, formed in 2012. RFA holds a long-term lease to a dolomite mine located in
Alabama. A Team was formed as the entity through which the mining operation would be
conducted. For several years prior to the commencement of the Debtor's chapter 7 bankruptcy
case, the Debtor was embroiled in litigation with Lewis and related parties in the state courts of
both Illinois and Alabama, concerning their respective rights in the mine and an aborted deal for
the Debtor to buy out Lewis's interest in the mine. The state court lawsuits are directly related to
what the Debtor considers to be his most valuable assets, the Alabama dolomite mine and his
claim for damages against Lewis. That history also helps to give context to the Debtor's
bankruptcy filing, to his testimony at the meeting of creditors and at trial, and to the breadth of
the allegations made by CHAT in the adversary complaint.

2

The Debtor managed the mine during the first year of its operation by A Team. In November 2013, the Debtor and Lewis executed an agreement, labelled a "Unit Purchase Agreement" (UPA), for the Debtor to buy out Lewis's interest in A Team and RFA. In the UPA, the equity structure of both LLCs is identified as 60% owned by Bradley Stevens, 30% owned by Whispering Brook LLLP and 10% owned by Midwest Bridge & Crane Inc. The Debtor and Lewis are identified as managers of A Team and RFA. Lewis is identified as a general partner of Whispering Brook and as president of Midwest Bridge. For ease of reference, the Court will continue to refer to the nature of the UPA as embodying an agreement for the Debtor to buy out Lewis's interest. It should be noted, however, that the agreement provides that if the Debtor fails to make the payments necessary to close the purchase by December 31, 2013, that Lewis would then have the option of buying out the Debtor's interest in A Team and RFA for the sum of $1,250,000. The Debtor did not make all of the payments necessary to close the purchase by the end of 2013. For reasons not explained to the Court, however, Lewis did not exercise his purchase option and litigation soon followed.

Of the thirteen claims filed against the Debtor in his bankruptcy case, only one is for a consumer debt. Of the remaining twelve claims, only one, that filed by Diane Toohill, is for a debt unrelated to the Alabama mine. The remaining eleven claims, which include two by CHAT, are all related, in one way or another, to money the Debtor borrowed to purchase the Alabama mine, debts he incurred in the operation of the Alabama mine or to claims asserted against him in the state court litigation with Lewis. Those eleven claims total approximately $3.9 million. Lewis and the entities he owns and controls filed five of those claims totaling approximately $2.9 million.

3

One of the claims filed by CHAT, Claim 6-1, includes a judgment debt that CHAT obtained by assignment from U.S. Bank in the amount of $641,000. In May 2016, U.S. Bank obtained a judgment in the state of Missouri against A Team as the principal obligor and against the Debtor and Lewis as individual guarantors. According to the Debtor's testimony at the meeting of creditors, Lewis negotiated and reached an agreement to pay U.S. Bank the sum of $401,000 in consideration of an assignment of the bank's rights under the judgment. The judgment was assigned to CHAT in August 2016. Claim 6-1 also includes a second judgment that CHAT obtained as plaintiff against the Debtor. Claim 6-1 lists the combined balance on the judgments as of the petition date as $748,280.38.

Another relationship relevant to this proceeding is that between the Debtor and his now former spouse, Mary Stevens. Prior to their first divorce, the Debtor borrowed $550,000 from her, which she, in turn, borrowed from Heritage Bank. These funds were paid by the Debtor to Lewis in his failed effort to buy out Lewis's interest. While the buy-out effort was ongoing between the Debtor and Lewis, the Debtor's marriage began to dissolve. He and Mary entered into a Marital Separation Agreement (MSA), dated December 26, 2013, which provided for the allocation of their property and debts. That agreement was incorporated into a judgment of dissolution granted by the state court on March 11, 2014.  Under the MSA, Mary retained all of the real estate with the exception of the Fairview strip-mine ground which the Debtor owned jointly with Diane Toohill. Mary was directed to sell three properties, retaining the first $525,000 of the net proceeds to satisfy the loan she obtained through Heritage Bank for the Debtor's benefit, with the balance of any net proceeds to be paid over to the Debtor.  After satisfaction of the Heritage loan, Mary was to convey two other properties to the Debtor. The Debtor retained his interests in A Team Mining and RFA, Centwar, Inc., Stevens of Illinois, Inc., McDonald's

Oil Agreement, and Shawnee Oil, LLC.  Mary was awarded as her sole property the business

interests in Frame Material Supply, Inc., BES Properties, LLC, and Jan's Auction Inventory.

The Debtor and Mary subsequently reconciled and remarried on December 20, 2014.

Their second marriage lasted only a few months before being dissolved. As part of that process,

the parties entered into another marital settlement agreement on March 25, 2015.  Other than

awarding the residence at 101 N. Trivoli Road in Trivoli, Illinois to Mary and the rental property

at 14740 W. Fieldcrest Drive in Brimfield, to the Debtor, the agreement left undisturbed the

allocation of property made in the prior dissolution. Mary filed a proof of claim in the

bankruptcy case for the sum of $151,546, representing the unpaid balance of the funds loaned to

the Debtor.

The Debtor filed his Chapter 7 petition on April 28, 2017, with the assistance of an

attorney with experience representing debtors. Charles Covey was appointed as chapter 7 trustee

(Trustee). In the original schedules and statement of financial affairs (SOFA), the Debtor

disclosed that he had made transfers totaling $3,675 to his father, Bill Stevens, within the year

preceding the filing of the petition, for payments on a loan. In response to Question #27 of the

SOFA, which requires the Debtor to identify, itemize and describe all ownership interests in

corporations, unincorporated businesses, limited liability companies or partnerships, which he

had within four years of the commencement of the case, the Debtor listed his ownership interest

in several businesses, including A Team and RFA, describing those businesses as existing on the

petition date.

On Schedule A/B, the Debtor listed a pending lawsuit against Jerry Lewis, valued at

$655,000. The Debtor valued his interest in A Team at $540,000 and his interest in RFA at

$12,500,000. On Schedule D, Kenny Balagna is identified as a secured creditor, holding a lien on

five vehicles, including a 2013 BMW 740i, a 2009 Chevy Tahoe, a 1994 Chevy Monte Carlo, a

2001 Harley Davidson Road King and a 2000 Harley Davidson Fat Boy. Balagna filed a claim in

the amount of $146,500, classifying the debt as unsecured. The Debtor listed Mary Stevens, his

former spouse, as an unsecured creditor on Schedule F.

The first meeting of creditors was set for June 7, 2017.  The Debtor did not appear on that

date and the meeting was continued to June 28, 2017.  At the meeting, the Debtor testified at

length in response to questioning from the Trustee and the attorney for CHAT. His testimony and

subsequent amended schedules will be discussed below in the context of specific Counts of the

adversary complaint. With court approval, the Trustee hired an attorney to potentially recover

real estate and/or amounts due from Mary Stevens under the MSA, although no recovery action

has been filed against her.

The Trustee reached a compromise with respect to payments made by the Debtor during

the year preceding bankruptcy, on a loan made by Heritage Bank of Central Illinois/Morton

Community Bank to his parents, Bill and Kay Stevens, as well as with respect to the Debtor's

transfer of a 1994 CAVCO trailer to them.  The Debtor's parents agreed to pay $23,000 to the

Trustee.  As part of the compromise, CHAT was paid $13,000 by the Trustee in satisfaction of its

claimed lien upon the trailer.

 On his original schedule A/B, the Debtor listed an interest in 23 acres of real estate

located near Fairview, Illinois. On May 31, 2017, he filed an amended schedule A/B to clarify

that he owned a 50% interest in the land as a tenant in common, stating the value of his interest

to be $18,000. In January 2018, the co-owner, Diane Toohill, filed a motion for relief from the

automatic stay to file a foreclosure action in order to obtain title free and clear of the Debtor's

interest. In the motion, Toohill alleged that CHAT had recorded two memoranda of judgment

with the Fulton County Recorder thereby encumbering the Debtor's half-interest in the real

estate with judgment liens. The motion alleges that Toohill had paid CHAT the amount of

$13,500 for an assignment of the judgment liens. The motion was granted without opposition

from the Trustee.

Beginning in June 2018, the Trustee endeavored to sell the Debtor's interests in both A

Team and RFA.  The Debtor's interest in those companies at that time was a 60% interest in A

Team and a 50% in RFA, the Debtor having previously sold a 10% interest in RFA to Larry

Korth in February 2015 for $250,000, in an effort to raise funds to enable him to continue to

litigate to protect his interest in the mine property. The Trustee's effort to sell the Debtor's

interests in those entities was severely hampered by the fact that the Debtor's interests were

encumbered by prepetition charging orders entered in favor of CHAT in aid of enforcement of its

judgments against the Debtor. That impediment to sale, coupled with the fact that the mine had

not been operational for several years, resulted in the Trustee receiving no outside offers.  CHAT

offered to purchase the estate's interest for $10,000, including, as additional consideration, a

waiver by Lewis of any administrative claims in the bankruptcy proceeding. (The Debtor had

continued to pay the RFA lease payments prior to his bankruptcy; Lewis has been making the

payments since the bankruptcy filing.) The Debtor objected to the Trustee's proposed sale to

Lewis, offering to pay more than CHAT had offered. The Debtor appeared at a hearing on

September 17, 2018, presenting the Trustee with a cashier's check for $12,000, setting the stage

for a courtroom auction between the two parties. At the Court's suggestion, the Debtor retained

counsel to represent him on that issue.  At a hearing, the Court acknowledged being concerned

with the proposed purchase by CHAT, expressing concern that CHAT was attempting to use the

bankruptcy process to strip the Debtor's interest in the property for a nominal price, after both

7

the Debtor and Lewis had apparently believed the leasehold interest in the mine to be worth in

excess of a million dollars when they negotiated their buy-out agreement. Ultimately, the Trustee

moved and was permitted to abandon the Debtor's interests in A Team and RFA, thereby

allowing the issue of the ownership of the mine to be resolved in the state court litigation.

CHAT commenced this adversary proceeding by filing its complaint on October 5, 2017,

alleging that the Debtor's discharge should be denied under three subsections of Section 727 and

that its claims should be determined nondischargeable based on a false financial statement

submitted to U.S. Bank; defalcation and fraud while acting in a fiduciary capacity; and willful

and malicious injury. The Debtor, representing himself without a lawyer in this adversary

proceeding, filed a one-sentence response, denying all allegations.  The Trustee did not object to

the Debtor's discharge or join in CHAT'S objection.

The matter proceeded to trial on July 10, 2018.  The Debtor was the only witness called

to testify by CHAT. The Court carefully observed his demeanor and listened to the Debtor

during the entire trial. Based upon his demeanor, the substance and context of his testimony, and

his interactions with opposing counsel, the Court found the Debtor to be credible. At trial, CHAT

focused on Counts One, Three and Six, seeking denial of the discharge because of the Debtor's

failure to properly disclose former business interests and contingent property interests created in

the MSA, and seeking, alternatively, denial of the discharge and a determination of

nondischargeability because of the Debtor's prepetition grant of liens on his vehicles to Kenny

Balagna.

According to his testimony at trial, the Debtor has held ownership interests in a number

of businesses during his lifetime, estimating the number between ten and fifteen. The Debtor

stated that he was the president and owner of NepCo Inc., a steel door and frame company,

which he sold in 1999.  At that time, in connection with the sale, he formed Stevens of Illinois

Inc.  That corporation never ran any operations and has since been dissolved. The Debtor

testified that he owned KS Marine Products, a corporation which he sold more than four years

ago, netting $170,000.  He testified that he also owned JAN Transportation, a trucking company,

which closed in 2010 or 2011.

In response to CHAT'S inquiry regarding his interest in McDonald Oil Co., the Debtor

stated that he first made investments in various wells owned by McDonald Oil Co. in 2008. His

investments in the individual wells varied from 5% to 75%.  The Debtor testified that the last

well went dry in 2012 or 2013.  In 2006, the Debtor made an investment in Shawnee Oil, an

entity formed for the drilling of shallow oil wells in McDonough County.  The Debtor testified

that the venture failed and the investors lost their funds.  Fraud was suspected, but based upon

legal advice, the principal of the company was not pursued.  The Debtor testified that his

personal investment in Dynasty Capital Partners, made in early 2000, was liquidated during 2012

or 2013, around the time when he acquired the interest in the Alabama mine.

The Debtor testified that in November 2012, he and Lewis formed A Team and RFA. A

Team was the operating entity, engaged in quarrying dolomite.  RFA held the leasehold interest

and the rights to extract minerals. Though the ownership interest in A Team was originally

70/30, as between the Debtor and Lewis, early in 2013, the Debtor's interest decreased to a 60/40

split. A Team entered into a line of credit borrowing agreement with U.S. Bank, granting a

security interest in accounts, inventory and equipment. In support of that loan application, the

Debtor and his wife submitted to the Bank a financial statement dated December 3, 2012,

attaching a personal financial statement prepared as to both he and Mary, dated September 18,

2012.  Both the Debtor and Lewis personally guaranteed the U.S. Bank loan. The mine became

operational in January 2013, and the Debtor worked full-time running the mining operation for the first thirteen months.

The Debtor testified that in April 2013, disagreements began to arise between he and Lewis over how the mine should be run, resulting in Lewis taking over the operational management of the mine in early 2014.  Lewis hired Tom Baker to assume responsibility for the financial side of the business. From that point on, the Debtor was unaware of the draws taken on the line of credit. The conflict between the parties escalated after the Debtor's attempt to buy out Lewis failed and litigation between them is ongoing in Talladega County, Alabama and Fulton County, Illinois.

Regarding his contingent interests under the MSA, the Debtor testified that he has not received any funds or property from Mary, because she has not been fully repaid for the monies she borrowed from Heritage Bank that she loaned to him.

In closing argument, CHAT conceded that its evidence was focusing on only three of the six counts in the complaint, those being Count Three, for false oaths; Count One, for transfers to defraud creditors; and Count Six, for willful and malicious injury.  CHAT emphasized, however, that it was not abandoning Counts Two, Four or Five.

## DENIAL OF DISCHARGE

Pursuant to section 727(a) of the Bankruptcy Code, the court must grant a debtor a discharge unless one of the enumerated grounds for denying a discharge applies. 11 U.S.C. section 727(a).  A discharge in bankruptcy is not a fundamental right extended to all, but a privilege which is only granted to the honest debtor.  *Matter of Yonikus*, 974 F.2d 901 (7th Cir. 1992). Denial of a debtor's discharge is regarded as an extreme and drastic remedy and the

statutory exceptions to discharge are construed liberally in favor of the debtor and strictly against

the objecting creditor. *Matter of Juzwiak*, 89 F3d 424 (7th Cir. 1996). *In re Lindemann*, 375

B.R.450 (Bankr.N.D. Ill. 2007). The objecting creditor must establish grounds for denial of the

discharge by a preponderance of the evidence. *In re Scott,* 172 F.3d 959, 966-67 (7th Cir. 1999).

Since denial of discharge is an extreme measure, the reasons for denying a discharge must be

real and substantial, not merely technical and conjectural. *In re Lang,* 246 B.R. 463, 468 (Bankr.

D. Mass.), *aff'd,* 256 B.R. 539 (1st Cir. BAP 2000).

## Count Three:  §727(a)(4)(A)

Section 727(a)(4)(A) provides that:

> (a) The court shall grant the debtor a discharge, unless –
>> (4)  the debtor knowingly and fraudulently, in or in connection with the case -
>>> (A) made a false oath or account.

In order to prevail under this provision, the plaintiff must establish that: (1) the debtor made a

statement under oath; (2) that the statement was false; (3) the debtor knew the statement was

false; (4) the debtor made the statement with fraudulent intent to deceive; and (5) the statement

related materially to the bankruptcy case. *Stamat v. Neary*, 635 F.3d 974 (7th Cir. 2016).  A

debtor's petition, bankruptcy schedules and statement of financial affairs all constitute statements

under oath for the purpose of section 727(a)(4)(A).  Both affirmative misstatements and

omissions can qualify as false statements.  A discharge should not be denied, however, where the

falsehood was the result of an innocent mistake or mere inadvertence.  *In re Brown,* 108 F.3d

1290 (10th Cir. 1997); *In re Von Behren*, 314 B.R. 169 (Bankr. C.D. Ill. 2004).  A false

statement or omission that has no impact on a bankruptcy case is not material.  *Khalil*, 379 B.R.

163, 172 (9th Cir. BAP 2007).  An omission of an asset that has little or no value may, for that

reason, be immaterial.  *In re Bailey*, 147 B.R. 157 (Bankr. N.D. Ill. 1992).

Section 727(a)(4)(A) does not impose a strict liability standard; a debtor's wrongful

intent is paramount. *Chu v. Texas,* 572 B.R. 177, 181 (N.D. Tex. 2015). Because direct evidence

of fraudulent intent via an admission is rarely available, intent may be established by

circumstantial evidence. *Matter of Snyder*, 152 F.3d 596 (7th Cir. 1998). Courts have found that

the cumulative effect of a series or pattern of inaccuracies or omissions may rise to the level of a

reckless and cavalier disregard for the truth sufficient to support a finding of fraudulent intent.

*Stamat v. Neary*, 635 F.3d 974 (7th Cir. 2011).

Where inaccuracies appear on a debtor's initial schedules, it is important for the court to

examine whether the inaccuracies were subsequently corrected through the filing of amended

schedules. It is also very important for the court to determine whether, during his testimony at

the meeting of creditors, the debtor testified truthfully and accurately or whether he continued to

provide incorrect or misleading information. A debtor who repeatedly lies or fails to clear up

inconsistencies once brought to his attention, is generally considered to deserve the ultimate

punishment of denial of discharge. On the other hand, a debtor who readily corrects prior

mistakes in a willing and prompt fashion is usually determined not to have had the requisite

fraudulent intent required for denial of discharge. *In re Heath,* 2018 WL 702825 (Bankr. E.D.

Tenn.); *In re Babb,* 358 B.R. 343, 355-56 (Bankr. E.D. Tenn. 2006).

One of the many exhibits submitted by CHAT at trial is a complete transcript of the

Debtor's testimony at the meeting of creditors that was conducted on June 28, 2017. During a

discussion with CHAT's counsel at trial concerning the admission of that exhibit, the Court

mistakenly indicated that the exhibit need not be admitted. The Court now corrects that error by

12

deeming the transcript from the meeting of creditors, identified as Plaintiff's Exhibit 4, to be admitted into evidence.

CHAT alleges that the Debtor made multiple false oaths in the SOFA and in his schedules by failing to disclose business interests that he owned; failing to disclose property settlement obligations owing to him under the 2014 dissolution judgment; failing to disclose ownership of jewelry, collectibles, household contents or furniture; failure to disclose ownership of rental property awarded to him in the dissolution; and failure to disclose the cash value of certain whole-life, life insurance policies in which he had an ownership interest.

At trial, the Debtor testified that he did not, as is customary for debtors with experienced bankruptcy counsel, begin the process by filling out and submitting to his attorney a basic information sheet or questionnaire designed to elicit the necessary information for completion of the bankruptcy papers. Instead, he and his attorney went over and filled in the SOFA and schedules together, apparently without any preliminary worksheets. Most bankruptcy attorneys recognize that while the debtor is responsible for initially disclosing their assets, prepetition transfers and other required information to their attorney, it is the attorney's responsibility to prepare the schedules for filing by placing the information provided by the debtor in the correct location on the schedules. It is also the attorney's responsibility to take reasonable steps to ensure that the information provided by the debtor is complete and accurate, by further reviewing with and questioning the debtor about the information provided. Not using a worksheet or preliminary questionnaire hinders that process and increases the likelihood of errors being made. It was apparent to the Court from his testimony, that the Debtor did not review the financial statement submitted to U.S. Bank or his divorce judgment in preparation for filing bankruptcy, as he had some difficulty recalling the information set forth in those documents. Notwithstanding the

13

unconventional procedure followed by his attorney, the Debtor stated that he read the documents

prepared by his attorney and signed them at the attorney's office. The Debtor admitted that

certain omissions and inaccuracies were brought to his attention at the meeting of creditors.

According to the Debtor, the omissions were due to either an oversight or misunderstanding of

what was required on his part or an error made by his attorney. His testimony at the meeting of

creditors was truthful and most of the omissions were promptly corrected by amendments.

**Business Interests**

Question 27 of the of the SOFA requires the debtor to list the names, addresses, taxpayer

identification numbers, nature of businesses, and beginning and ending date of all businesses in

which the debtor was a sole proprietor, or was self-employed in a trade, profession, or other

activity either full or part-time, or was a member of a LLC or LLP, a partner in a partnership, or

an officer, director, partner, or managing executive of a corporation, within four years

immediately preceding the commencement of the case, or in which the debtor owned 5 percent

or more of the voting or equity securities, during that same time period.  In his initial SOFA

filing, in addition to listing his interests in A Team and RFA, the Debtor disclosed a business

interest in four other companies, showing each to be in existence on the date the petition was

filed.  At the meeting of creditors held on June 28, 2017, the Debtor was questioned about and

gave candid answers regarding several businesses, including A Team and its equipment, RFA

and its real estate lease, Doors, Hardware & More, BES Properties, FMS, KSM, Stuff's Bar and

Grill, Stevens Point Bar and Blackwater Draw. The Debtor estimated to CHAT's attorney that he

has owned fourteen businesses in his lifetime. From a review of his testimony at the meeting of

creditors, the Court concludes that the Debtor was not intentionally trying to hide any

information about his businesses or otherwise. Approximately three weeks after the meeting of

creditors, the Debtor amended the SOFA, listing his interest in three additional entities, Stevens

of Illinois, Inc., McDonalds Oil Agreement, and Q.T.W.W., disclosing that his interest in all

three terminated in 2013 or 2014.

The MSA with Mary, agreed to in December 2013, provided that the Debtor would retain

his interest in A Team, RFA, Stevens of Illinois, Inc., McDonald's Oil Agreement, Shawnee Oil,

LLC and Centwar, Inc. Mary was awarded the business interests of Frame Material Supply, Inc.,

BES Properties, LLC, and Jan's Auction Inventory.

CHAT, based on the financial statement submitted to U.S. Bank and on the allocation of

property under the dissolution judgment, attempted to establish that several additional entities

should have been disclosed by the Debtor in SOFA Question #27.  CHAT interrogated the

Debtor regarding his ownership interests in NepCo., Inc., Jan Transportation and Dynasty

Capital Partners, entities which were not scheduled.  In response to CHAT's questioning, the

Debtor's testimony disclosed that he no longer held any interests in those companies, having sold

them or lost his investment well before filing bankruptcy. The Debtor sold his interest in NepCo.

Inc. in 1999, and Jan Transportation was closed in 2010 or 2011, more than four years before

bankruptcy. The Debtor characterized Dynasty Capital Partners as an investment fund, not a

business interest, that he purchased in the early 2000's and sold when he bought the mine or

when he tried to buy out Lewis.

He previously owned an interest in some oil wells through Shawnee Oil and McDonald's

Oil Agreement. He bought the McDonald's interest in 2008 and the wells went dry after five

years. He invested in Shawnee Oil in 2006 but lost his money through what he characterized as

fraud by the seller. He testified that Stevens of Illinois was an entity that he formed after the sale

of NepCo., Inc. but that it never operated any business. IPAS, Inc. d/b/a Centwar was an internet

auction company that dissolved about a year before he bought the mine, which was more than

four years before bankruptcy. The entity called Doors, Hardware and More was properly listed

on the SOFA and Schedule B, so the Debtor was not asked about this entity at trial. At the

meeting of creditors, he testified that he formed that entity to eventually get back into the door

business, but that did not happen so the corporation was never more than a shell with no assets.

According to the Debtor's testimony, other than A Team and RFA, he had no interest in any

other active business on the date of the petition.

The Court finds that the disclosure of business interests that the Debtor made in

paragraph 19 of schedule B, filed with his petition on April 28, 2017, was correct as filed. Three

weeks after the meeting of creditors, the Debtor amended his answer to Question #27 of the

SOFA to add three business interests: Stevens of Illinois Inc., McDonald's Oil Agreement and

Q.T.W.W. Those business interests were not brought up at the meeting of creditors. It thus

appears that the amendment to the SOFA was an effort by the Debtor to volunteer additional

information that perhaps should have been included on the initial SOFA. So this is not a situation

where a debtor amends schedules only after having been caught in a prior omission. The

Debtor's testimony at the meeting of creditors and at trial was candid and forthright. He

answered all questions asked and was willing to volunteer additional information. It is not even

clear from the record that any of the three entities added to the amended SOFA were actually

required to be disclosed in response to Question #27. Stevens of Illinois, Inc. was an empty shell

that never operated any business, McDonald's Oil Agreement appears to have been a financial

investment, not a business interest of the debtor, that was liquidated prior to the relevant look-

back period, and Q.T.W.W. is referred to in the MSA as a stock interest, i.e. an investment, not a

business interest.

The Court finds that the omission of those three entities or investments on his original SOFA, even assuming, based upon what they were and the timing of their sale or dissolution, that they were required to be disclosed in the first place, does not rise to the level of a false oath made knowingly and fraudulently. The Debtor's testimony at the meeting of creditors and the amendment to the SOFA rebut the inference that the initial omission was fraudulent. To the extent that the Debtor's initial disclosures could be said to be overinclusive because he listed certain business interests that he no longer owned or were not operational, thereby perhaps complicating the Trustee's inquiry, such overstatements cannot serve as the basis for denying the Debtor a discharge.  See *In re Packer*, 586 B.R 274 (Bankr. N.D. Ill. 2018) (overinclusion of assets not fraudulent); *In re Smith*, 489 B.R. 875 (Bankr. M.D. Ga. 2013). CHAT's theory that the Debtor was trying to hide his business assets or that he was operating a shell game is simply not supported by the record.

**Judgment of Dissolution**

It should be noted that Mary Stevens was on CHAT's witness list, but CHAT chose not to call her as a witness. Under the terms of the judgment of dissolution and the MSA, the Debtor was to receive certain properties, contingent upon the loan which Mary obtained for the Debtor's attempted purchase of Lewis's interest in A Team and RFA, being fully repaid. The Debtor, not having initially scheduled this contingent interest, corrected the omission in the second amended Schedule A/B, filed three weeks after the first meeting of creditors. At the meeting of creditors, the Debtor testified that Mary loaned him $555,000 to buy out Lewis's interest in the mine, that as a consequence of that loan she received all of the real estate in the divorce, that he would only get anything back if she sold the property for enough money to satisfy her loan in full, and that she did sell some properties but not for enough to pay off the $555,000 loan in full, so he never

received anything from her. At trial, the Debtor testified that he had made no payments to Mary to pay down the debt and that he had no ability to pay her.

From the Debtor's testimony and the record before the Court, the Court determines that the Debtor's belief that he had little chance of receiving any additional properties or funds from Mary pursuant to the MSA was neither groundless nor unreasonable. More importantly, however, the Debtor testified at the meeting of creditors in response to direct and specific questions from the Trustee, very candidly about the divorce and the nature of his contingent interest. It is readily apparent that he was not attempting to hide the true facts. Instead, he holds a sincere belief that he is unlikely to ever receive anything back from Mary. Shortly after the first meeting, he and his lawyer amended Schedule A/B to specifically disclose the contingent interest arising from the divorce settlement. While the contingent interest should have been scheduled initially, the Debtor testified truthfully and promptly corrected the omission.

The Court finds that the initial omission of this contingent interest on Schedule A/B was not made with any fraudulent intent by the Debtor. Furthermore, the Trustee's ability to verify the terms of the divorce settlement and investigate the potential for value available to the estate was not impeded by the omission, since the information was provided at the meeting of creditors. The record reflects that the Trustee retained an attorney, Andrew Covey, in September 2017, for the purpose of investigating the potential for a cause of action against Mary Stevens. The Trustee has not filed suit against Mary Stevens and nothing in the record indicates that she ever paid anything to the Trustee on account of any possible liability she might have to the estate. At this point seventeen months after the retention of the Trustee's attorney, the Court can only assume that the Trustee, with advice from his attorney, has determined that any potential claims against

Mary Stevens arising out of the marital settlement agreement have no value that could be realized by the estate.

In response to CHAT's inquiry regarding the award to him under the judgment of his interest in "rental" property at 14740 W. Fieldcrest Drive in Brimfield, the Debtor explained that the home belonged to his brother, with whom he was living at the time.  The Debtor stated that he was paying his brother rent and denied having any ownership interest in the property.

**Insurance**

On original Schedule A/B, the Debtor listed an interest in only one insurance policy, issued by Country Financial with a cash surrender value of $3,000. No other policies were listed on either the first amended or second amended Schedule A/B. At the meeting of creditors, however, the Debtor testified that on the date the petition was filed he owned two policies from Country Companies with total cash value of $3,000 between them. The Debtor also testified that he had assigned a life insurance policy with a "face value" of $275,000 as part of his effort to buy out Lewis's interest in the mine. The Unit Purchase Agreement attached to the state court pleadings filed by Lewis, attached to his Claim 10-1, identify the assigned policy as a Canada Life Insurance Policy in the amount of $275,971, which appears to be the death benefit, not the cash value, insuring the life of Bradley Stevens. It provides that the policy is pledged and assigned to Jerry Lewis to secure a $268,000 note to be signed as part of the purchase agreement, with the assignment to be released upon payment in full of all of the Debtor's obligations under the agreement. Presumably, the disposition of that insurance policy will be determined by the state court in Alabama or in Illinois.

At trial, CHAT inquired as to the disposition of several insurance policies listed on the financial statement provided to U.S. Bank. The Debtor again testified that he gave the Canada Life policy, which was listed on the financial statement submitted in 2012, to Lewis when he attempted to buy out his interest and that Lewis continues to retain that policy. In response to CHAT's inquiry regarding the policies owned at the time of the dissolution with listed amounts of $56,574 and $31,914, without specifying whether the amounts refer to death benefits or cash value, the Debtor testified that Mary is the owner of those two policies, likely referring to the divorce settlement, and that she has refused to turn over the policies to him until she has been paid in full.

Significantly, there are no insurance policies or related documents in the record. There are no statements from any insurance company that would substantiate the cash surrender value of any policy, the existence and amounts of any loans against the cash value, or even identify the true owner of any policy. The record before the Court compels the conclusion that the Debtor did not knowingly and fraudulently fail to disclose any insurance policy.

**Other Miscellaneous omissions**

CHAT's position that the Debtor fraudulently failed to disclose ownership of jewelry, collectibles, household contents and furnishings is, in context, trifling and inconsequential and is not supported by the evidence. It is important to put these remaining allegations of material omissions in the proper context. On his initial Schedule A/B and the first amended Schedule A/B filed prior to the meeting of creditors, the Debtor listed two parcels of nonresidential real estate, four motor vehicles, two motorcycles, two jet skis and a trailer. He listed computers and a phone, clothing, and two checking accounts. He carefully listed what he considered to be his most valuable assets, his ownership interest in A Team and RFA, valued at $13 million, as well as his

related claims for damages against Lewis, valued at $655,000, and a related receivership escrow account in the amount of $12,000. He scheduled a 2016 tax refund in the amount of $9,825. These disclosures of the most valuable assets refute the allegation that the Debtor was intentionally or recklessly disregarding his duty of disclosure.

On his initial Schedule A/B and his first amended Schedule A/B, in paragraph 6 pertaining to household goods and furnishings, the Debtor checked the "no" box indicating that he owned no household goods and furnishings. At the meeting of creditors, in response to questioning by CHAT's attorney, the Debtor testified that in fact, he owned an easy chair, a toaster and some other household items that might be worth $2,500. He stated that the Schedule A/B statement that he owned no household goods and furnishings was "not correct." His attorney was present with him at the meeting of creditors. When the second amended Schedule A/B was filed three weeks later, prepared by his attorney, the same incorrect assertion was made, that he owned no household goods and furnishings, in contradiction to his testimony at the meeting of creditors. The Court blames this oversight on the Debtor's attorney, whose job it was to make sure that the second amendment to Schedule A/B correctly included the new information that came out at the meeting of creditors. Obviously, since he already testified at the meeting of creditors that he owned household furnishings, he had nothing to gain by repeating the earlier error. This is not a case where a debtor, at the meeting of creditors, fails to truthfully acknowledge an omission in his schedules. Truthful testimony at the meeting of creditors is the most probative evidence of a debtor's intent.

The Debtor's testimony at the meeting of creditors was truthful, establishing that he was not trying to hide his interest in household goods and furnishings. The failure to correct the earlier omissions when the second amended Schedule A/B was filed is attributable to his

attorney's oversight. The Debtor had already testified truthfully at the meeting of creditors so the

Trustee had the information necessary to investigate the value of the items, if the Trustee in his

judgment believed there might be value there for the estate. Moreover, these household goods

and furnishings were not shown to have substantial value. Apparently, neither the Trustee nor

CHAT bothered to investigate the issue by inventorying and appraising the items. Although

given the present posture of the case, the Trustee may have decided that if CHAT's citation lien

is unavoidable, there is no value for the estate; and unless CHAT's lien is avoided, the lien will

pass through this bankruptcy case and remain enforceable post-bankruptcy against non-exempt

personal property owned by the Debtor as of the petition date. It is likely that CHAT, as well as

the Trustee, placed no weight on the Debtor's "top of the head" guess that the furnishings might

be worth $2,500 at a garage sale, a value that seems unrealistic.

The Debtor added the following previously unscheduled property on the second

amended Schedule A/B, filed after the first meeting of creditors:  a sapphire stone @ $1,300; a

tanzanite stone @ $1,500; and NASCAR Collectibles @ $1,200. The marital settlement

agreement provided that the Debtor was to retain his interest in a 1.67 sapphire stone, a .80

Tanzanite stone and the NASCAR and coin collections. At trial, the Debtor testified that he may

only have one of the loose stones, but he could not recall which one.  He also denied having a

coin collection, even at the time of the divorce, or owning any gold coins at the time he filed

bankruptcy. He testified that he had some gold coins previously that were sold in 2012 when he

bought his interest in the mine. He also testified that in 2012 he gave three gold coins "back to

his uncle." He characterized the NASCAR collection as a set of plastic cars. The second

amendment to Schedule A/B correctly discloses the sapphire stone, the tanzanite stone and the

NASCAR collectibles. These items were not discussed at the meeting of creditors. The Court

concludes that the second amendment to Schedule A/B was made voluntarily and in a good-faith

effort to correct a previous omission, which the Court concludes was not made with any

fraudulent intent. Additionally, nothing in the record indicates that the Trustee has taken any

action to administer these assets.

**Count One:  §727(a)(2)**

Section 727(a)(2) of the Bankruptcy Code provides as follows:

The court shall grant the debtor a discharge, unless . . . the debtor, with intent to
hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property
under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to
be transferred, removed, destroyed, mutilated, or concealed—

(A)  property of the debtor, within one year before the date of the filing of the petition.
11 U.S.C. §727(a)(2)(A).

Section 727(a)(2) encompasses two elements:  1) a disposition of property, such as a

transfer, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor

through the act of disposing of the property. *In re Kontrick,* 295 F.3d 724 (7th Cir. 2002).

CHAT's theory under this section is that the Debtor transferred a security interest in five vehicles

to Kenny Balagna within the year preceding bankruptcy; that at the time of the transfer, CHAT

held a statutory lien on all of the Debtor's personal property assets, having previously served him

with a Citation to Discover Assets to enforce a judgment; and that the transfer was intended by

the Debtor to hinder, delay or defraud CHAT.

The Debtor scheduled Balagna on schedule D as a secured creditor owed approximately

$120,000 and holding a lien on a 2013 BMW, a 2009 Chevy Tahoe, a 1994 Chevy Monte Carlo,

and two Harley Davidson motorcycles. In November 2012, Balagna loaned the Debtor $100,000

to be used toward the Debtor's purchase of the mine in Alabama. Initially, the loan was

unsecured. At some point before bankruptcy, the Debtor gave the certificates of title to the five

vehicles to Balagna to hold as security for the loan. Also at some point prior to bankruptcy, as

pointed out by the Trustee at the meeting of creditors, Balagna and/or the Debtor must have

taken some action to cause Balagna's lien to be noted on the titles, as Balagna had given the

titles to the Trustee prior to the meeting of creditors.

At trial, the Debtor testified that he had given Balagna four of the titles near the time

Balagna made the loan to him.  The Debtor testified that he was uncertain if he signed the titles

at that time.  At the meeting of creditors, on questioning from the Trustee, the Debtor seemed

confused about how or when the lien was noted on the titles. Eventually, he stated his

recollection that it was Balagna who put a lien on the titles in November or December of 2016.

When the Trustee told the Debtor that Balagna had given the titles to the Trustee and that the

liens were dated January 20, 2017, the Debtor said "yeah, that could be right." Upon further

questioning, the Debtor again stated that it was Balagna who put the liens on the titles. When the

Trustee asked him "well, you worked with him and gave him the titles, is that correct?", the

Debtor answered "right. Right." No follow-up questions were asked.

At the meeting of creditors, the Debtor was questioned extensively by both the Trustee

and CHAT's attorney about Balagna having obtained possession of the certificates of title and

that Balagna's lien was actually noted on the titles as of January 20, 2017. It is apparent from his

testimony that the Debtor did not understand the legal significance of when the notation of

Balagna's lien was actually placed on the titles, either vis-à-vis the Trustee or CHAT. No

explanation of that significance was given to him on the record. Looking at the entire record of

his testimony, the Court concludes that the Debtor was not trying to mislead anyone. It is not

even clear that the Debtor understood the difference, in effect, between giving a creditor physical

possession of a certificate of title versus granting a lien by filling in and signing the appropriate

portion on the certificate of title. Although the certificates of title were in the possession of the

Trustee at the meeting of creditors, nothing in the record reflects that the certificates were ever

handed to the Debtor or shown to him so that he could better understand exactly what the

questions were getting at.

In response to questions from CHAT's attorney at the meeting of creditors, the Debtor

did not recall being served with a citation to discover assets in December 2016. He did recall

testifying in court in early January 2017 and giving information about his assets. When asked

whether he was aware that under the citation he was not allowed to transfer assets, the Debtor

responded "no." When asked why he gave liens on the vehicles to Balagna, the Debtor

responded that Balagna asked for the assets because the Debtor had not paid any principal or

interest on the loan. At trial, the Debtor was not asked any questions relating to the citation to

discover assets or about how, when or who put the liens on the titles.

In this Court's opinion, the evidence is insufficient to establish that the Debtor caused

the liens to be noted on the certificates of title on January 20, 2017, or at any time after he had

been served with the citation to discover assets. Because he had given the certificates of title to

Balagna previously, Balagna may have independently decided to complete the lien notation

portion on the back of the titles on January 20. There was no evidence introduced that the Debtor

signed the titles on that date or on any particular date. The titles were not introduced into

evidence at trial and are not part of the record. Balagna was not called to testify at trial. To the

extent that CHAT was attempting to create the appearance of a conspiracy or scheme between

the Debtor and Balagna to defraud CHAT, no evidence was presented of any communication

between the Debtor and Balagna that would support such a theory. The Debtor was asked no

questions about any communication he may have had with Balagna.

Even if the Debtor did sign the lien notations on January 20, 2017, he testified that he

was not aware that being served with a citation to discover assets restricted his ability to transfer

or create a lien on an asset. That testimony was unrebutted. In addition, assuming liens were

granted in January 2017, by granting a lien to a previously unsecured creditor like Balagna, the

Debtor was intending to give a preference to him. Generally, using one's property to make a

preferential transfer, does not give rise to an inference that a debtor was intending to hinder,

delay or defraud another creditor. For purposes of discharge and dischargeability, courts

generally do not treat an involuntary lien the same as a consensual lien granted knowingly and

voluntarily by the debtor. A debtor's intentional conversion of a secured creditor's collateral is

strong circumstantial evidence that the debtor acted willfully and maliciously because a debtor is

presumed to know the property on which he has granted a consensual lien. A similar

presumption of knowledge does not apply with respect to liens that arise involuntarily by

operation of a statute. There is no evidence to indicate that the Debtor intended to or was even

aware that he may have been granting Balagna a lien on property in which CHAT had some prior

interest. The Debtor was not asked a direct question about his intent with respect to CHAT. The

Court concludes that CHAT has failed to prove what action, if any, was actually taken by the

Debtor after having been served with the citation or that the Debtor acted with the requisite state

of mind.

## Count Two:  §727(a)(3)

CHAT also contends that the Debtor's discharge should be denied under section

727(a)(3) which denies a discharge to a debtor who has "concealed, destroyed, mutilated,

falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. §727(a)(3). CHAT alleges that the Debtor testified at the meeting of creditors that he had turned over an electronic version of certain financial records of various limited liability companies to an unnamed third party, and failed to provide further information to the Trustee, as he had promised to do at the meeting. CHAT also alleges that the Debtor failed to properly maintain the records at the business location of the limited liability companies, making it impossible for the parties in interest to ascertain the Debtor's financial condition and relevant transactions.

CHAT introduced no evidence at trial on these allegations. The Debtor was asked by CHAT's attorney where the books and records of A Team are presently located. He responded that the records are with Lewis or Thomas Baker or at the mine's office in Alabama. The only records that the Debtor testified having were what he called "some copies of all financial statements." He stated that these were stored in a building owned by his son located in Farmington, Illinois. He stated that those financial statements were used by him for tax filing purposes, with the last return having been filed in 2015.

In response to questioning by CHAT's attorney, the Debtor also testified that A Team's Apple Computer is located at the mine property, that a Hewlett-Packard laptop computer is also located at the mine property, and that a different Hewlett-Packard computer was previously sent by him to his attorney, Mark Owsley, to be returned to Lewis's attorney, Charlie Gaines. He stated that he hired an IT firm in the Peoria area to download the files on that computer before it was returned and the IT firm remains in possession of those files. If the Trustee believed he

needed to examine those records, he would have asked the Debtor's attorney to produce them.

The Trustee did not testify at trial, and there is nothing in the case docket to indicate any

assertion by the Trustee that the Debtor and his lawyer were not cooperating with the Trustee or

were not providing the Trustee with requested information. CHAT's allegation that the Debtor

failed to cooperate with the Trustee falls in the category of unproven speculation.

In addition, at the meeting of creditors and at trial, the Debtor testified extensively about

his interest in A Team, the history of his business relationship with Lewis, his attempt to buy out

Lewis, and the nature and substance of the ongoing litigation between him and Lewis, including

the nature and extent of his claims for damages against Mr. Lewis. In addition, the Debtor

testified about his sale of a 10% interest in the mine to Larry Korth. In light of that extensive

testimony, the Court fails to see why it would have been necessary for the Trustee, or CHAT for

that matter, to review A Team's records to be able to understand the nature and extent of the

Debtor's interests, or what relevance A Team's business transactions in 2013 and 2014 have to

this case. Lewis knows all there is to know about the Debtor's interest in the Alabama mine. To

the extent CHAT desires to compel the Debtor to produce A Team records not otherwise in the

possession of Lewis or Baker, Lewis should take that matter up with the Alabama and Illinois

state courts, CHAT not being a party to those lawsuits. There is no evidence in the trial record

that substantiates CHAT's claim for denial of discharge under section 727(a)(3).

## OBJECTION TO DISCHARGEABILITY

An action to determine the dischargeability of a debt under section 523(a) has two

components. First, the creditor must establish a debt owed by the debtor.  Whether the creditor

holds an enforceable obligation is determined by relevant substantive nonbankruptcy law.

*Butner v. U.S.*, 440 U.S. 48 (1979).  Once the creditor establishes a valid claim under

nonbankruptcy law, the bankruptcy court turns to the provisions of Section 523(a) to determine

the issue of dischargeability.  The standard of proof for exceptions to discharge under Section 523

is the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

**Count Six:  §523(a)(6)**

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by

the debtor to another entity or to the property of another entity."  11 U.S.C. section 523(a)(6). In

order to prevail, a creditor must establish by a preponderance of the evidence both a "willful"

and "malicious" injury.  A willful injury must be a deliberate or intentional injury, not merely a

deliberate or intentional act that leads to injury.  *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

"Malicious" means a conscious disregard of one's duties or without just cause or excuse; it does

not require ill will or a specific intent to do harm.  *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th

Cir. 1994). The debtor's subjective state of mind is the key focus of the inquiry.

Count Six is one of the three counts that CHAT focused on at trial. CHAT again relies on

the purported transfers of the vehicle liens to Balagna in January 2017, after service of the

citation to discover assets on December 12, 2016, which gave rise to a statutory lien on the

Debtor's nonexempt assets and prohibited the Debtor from making any transfer or other

disposition of those assets. CHAT contends that the Debtor's transfer of the liens to Balagna was

done willfully and maliciously by the Debtor with an actual, subjective intent to deprive CHAT

of assets available to satisfy the judgment it acquired from U.S. Bank.

As an initial matter, in Count Six, CHAT alleges that a determination of liability under

section 523(a)(6) would render the entire judgment debt nondischargeable, a proposition that is

clearly incorrect as a matter of law. This is not a case where the debt that gave rise to U.S.

Bank's judgment arose out of willful and malicious conduct of the Debtor. The subject matter of Count Six is limited to five vehicles. Where conversion or wrongful disposition of assets that are subject to a lien is alleged, the potential nondischargeable amount is capped at the value of those assets at the time of conversion. See *In re Wooten,* 423 B.R. 108, 135-36 (Bankr. E.D. Va. 2010). Proof of the value of motor vehicles is made through the testimony or report of an expert appraiser.

Various deficiencies in CHAT's case in chief at the trial are evident. First, CHAT introduced no appraisal or any other evidence of the value of the vehicles at trial. Second, as discussed previously in this decision, the evidence in the record falls short of proving what action, if any, was taken by the Debtor, after he had been served with the citation to discover assets, to cause Balagna's lien to be noted on the titles. Third, the Debtor's testimony, which the Court found credible, that he was unaware that the citation prohibited him from granting a lien on his property stands unrebutted. Fourth, the Debtor's testimony indicates that by giving the titles to Balagna, he was intending to at least partially secure what had been a wholly unsecured loan for money used to enable the Debtor to purchase his interest in the mine. In effect, he was treating Balagna preferentially. While a preferential transfer made within 90 days of bankruptcy may be avoidable in a bankruptcy case, it is not avoidable outside of bankruptcy. A prepetition preferential transfer, by itself, does not establish a willful or malicious state of mind of a debtor.

Nothing in the record indicates that the Debtor was intending to harm CHAT or that he was even aware that CHAT could be harmed if Balagna acquired a lien against the vehicles. The Debtor testified that he was unaware that a lien arises upon service of a citation to discover assets and the Court found this testimony to be credible. There is simply no proof that any injury to CHAT was caused deliberately or intentionally by the Debtor or that the Debtor acted with a

conscious disregard for his duties. In response to a question from CHAT's attorney, the Debtor

acknowledged that he was represented by a Missouri lawyer during the time in question but there

is no evidence that the Debtor read and understood the citation, or that he received an

explanation of the effect of a citation to discover assets from his lawyer or anyone else. He was

not asked these questions. This Court will not presume that he had such knowledge when he

testified that he did not and there is nothing further in the record to contradict that assertion.

The facts here are distinguishable from the more common dischargeability actions

brought under section 523(a)(6) where a debtor intentionally converts the collateral of a creditor

to whom he granted a consensual security interest. Moreover, to reiterate, there is no evidence

that the Debtor took any affirmative action after being served with the citation to cause

Balagna's lien to be inscribed on the titles, which were already in Balagna's possession

according to the undisputed testimony of the Debtor. The certificates of title were not produced

at trial and Balagna was not called as a witness. The evidence needed to prove the Debtor's

liability under Count Six was not produced.

For these reasons, the Court determines that CHAT failed to carry its burden of proof

with respect to Count Six, the dischargeability claim under section 523(a)(6).

**Count Five:  §523(a)(4)**

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in

a fiduciary capacity, embezzlement or larceny." 11 U.S.C. §523(a)(4).  To prevail under this

provision, a creditor must prove that (1) a fiduciary relationship existed between the creditor and

the debtor, (2) fraud or defalcation was committed by the debtor in the course of that

relationship, and (3) the creditor suffered a financial loss as a result of the fraud or defalcation. *In*

*re Patel,* 565 F.3d 963, 968 (6th Cir. 2009). Proof of fraud or defalcation requires evidence that

the debtor committed the breach of duty with a culpable state of mind, that being knowing and

intentional wrongdoing or a conscious disregard or willful blindness to a substantial and

unjustifiable risk that his conduct will turn out to violate a fiduciary duty. *Bullock v.*

*BankChampaign, N.A.,* 569 U.S. 267, 274 (2013).

In Count Five of its adversary complaint, CHAT alleges that under both Illinois and

Alabama law, upon the insolvency of A Team and of RFA, the Debtor's fiduciary duties, as a

manager of those entities, shifted from the equity holders to the creditors. CHAT alleges that it

was a creditor of A Team and RFA, having made loans to these entities totaling over $1.0

Million, as itemized on a summary attached to Claim 9-1. CHAT alleges that the Debtor

breached his fiduciary duties owed to the creditors of A Team, including CHAT, by committing

fraud and defalcation, as alleged in two lawsuits pending, respectively, in the state courts of

Alabama and Illinois. Count Five does not include any allegation of specific misconduct alleged

to have been committed by the Debtor.

The threshold problem for CHAT is one of standing. CHAT alleges it has standing to

bring a dischargeability suit under §523(a)(4) as a prepetition creditor of A Team. Most courts,

including this Court, have concluded, however, that an individual creditor of an entity has no

standing to bring a direct claim against an officer, director or manager of the entity for breach of

fiduciary duties, as the remedy is a collective one that is not personal to any one creditor. See *In*

*re Sever,* 438 B.R. 612, 629 (Bankr. C.D. Ill. 2010); *In re Netzel,* 442 B.R. 896 (Bankr. N.D. Ill.

2011). A creditor suing in his own name for his own benefit cannot state a claim for relief under

§523(a)(4). *In re Jahelka,* 442 B.R. 663, 671 (Bankr. N.D. Ill. 2010). CHAT's claim asserted in

Count Five, seeking to have its debts excepted from his discharge, is not a viable cause of action

under Section 523(a)(4) for lack of standing. Tellingly, the damages alleged by CHAT in Count

Five, the balance of its unpaid loans, is inconsistent with a cause of action for breach of a

manager's fiduciary duties, where damages are ordinarily measured by the decline of enterprise

value or deepening insolvency. The Debtor is entitled to judgment on Count Five on this basis. In

the alternative and in the interest of thoroughness, however, the Court will discuss other grounds

for denying the relief requested in Count Five.

The Debtor having filed his bankruptcy petition on April 28, 2017, the deadline for filing

an adversary complaint objecting to his discharge or to the dischargeability of a debt was

established as August 6, 2017. On July 7, 2017, a motion was filed to extend that deadline by

Lewis, Midwest Bridge, Whispering Brook and CHAT. The motion was granted without

opposition from the Debtor and the deadline as to those parties was extended to October 5, 2017.

CHAT commenced this adversary proceeding by filing its complaint, in a timely fashion, on

October 5, 2017. Neither Lewis, Midwest Bridge nor Whispering Brook filed an adversary

complaint. The Trustee also received an extension to file a complaint objecting to the Debtor's

discharge extending his deadline to November 6, 2017. The Trustee elected not to file a

complaint.

Certain pleadings from the Fulton County, Illinois lawsuit are attached to claim 10-1.

Those pleadings identify the Debtor and BES Properties as the plaintiffs and counter-defendants,

and further identify Lewis, Whispering Brook and Midwest Bridge as the defendants and

counter-plaintiffs. Pleadings from the Talladega County, Alabama lawsuit are attached as

exhibits to claims 7-1 and 10-1. Those pleadings identify Whispering Brook and Midwest Bridge

as the plaintiffs, the Debtor and A Team as the defendants, and Lewis and Thomas Baker as

third-party defendants and counterclaimants. The counterclaim filed in the Alabama lawsuit by

Lewis and Baker against the Debtor, alleges he breached the duty of loyalty, the duty of care, and a contractual covenant of good faith and fair dealing.

CHAT does not appear as a party to either the Alabama or Illinois lawsuits. The parties to those lawsuits who brought prepetition causes of action against the Debtor appear to be limited to Whispering Brook, Midwest Bridge, Lewis and Thomas Baker, none of whom filed an adversary complaint against the Debtor objecting to his discharge or to the dischargeability of a debt. The only such adversary complaint filed against the Debtor was filed by CHAT. The disconnect between the identity of parties to the state court lawsuits and CHAT as the sole plaintiff here, was not explained or addressed by CHAT.

When a person who has been sued by a creditor files for bankruptcy relief under Chapter 7, continued prosecution of the lawsuit is stayed by the automatic stay, and the creditor's claim is subject to being discharged if the debtor receives a discharge. If the creditor believes that its debt is nondischargeable under sections 523(a)(2), (4) or (6) of the Bankruptcy Code, the creditor must file a timely adversary complaint to have the question of dischargeability determined by the bankruptcy court. 11 U.S.C. §523(c)(1). If a timely complaint is not filed and the debtor receives a discharge, any and all causes of action asserting the personal liability of the debtor that were asserted or that could have been asserted prepetition, are discharged and enjoined from further prosecution under section 524 of the Bankruptcy Code. Only if the debtor's discharge is denied, may those prepetition claims against the debtor continue to be prosecuted post-bankruptcy.

It follows that when Lewis, Thomas Baker, Whispering Brook and Midwest Bridge elected not to file an adversary complaint against the Debtor seeking a declaration of nondischargeability of their claims against the Debtor, they chose, in effect, to put all of their eggs into one basket, that being the adversary complaint filed by CHAT for denial of the

Debtor's discharge under section 727 of the Bankruptcy Code. If the Debtor's discharge were to

be denied, any claims asserted against the Debtor in a prepetition lawsuit would not be

discharged and those suits could proceed post-bankruptcy. Once the Debtor receives a discharge,

however, all prepetition claims, filed and unfiled, fall within the scope of the discharge

injunction under section 524(a)(2), including claims by any creditor of A Team that the Debtor

breached a fiduciary duty while managing its affairs.

In any event, CHAT has failed to prove grounds for denial of the Debtor's discharge and

the Court determines that it failed to prove its claim for nondischargeability under section

523(a)(4) by failing to present any evidence whatsoever concerning the alleged insolvency of A

Team or RFA, what duties the Debtor owed to creditors upon insolvency, how those duties were

breached, and what damages were proximately caused by the breach.

One other issue related to Count Five and a broader position taken by CHAT at trial

must be addressed. During the course of the trial, CHAT advised the Court that while its

evidentiary presentation focused on Counts One, Three and Six, it was "not waiving" the

alternative claims asserted in Counts Two, Four and Five. It is not clear exactly what CHAT

intended by that statement. The entire complaint, all six counts, was scheduled to be tried on July

10, 2018 and was, in fact, tried on that date. The Court is thus required to evaluate the merits of

each of the six counts in light of the evidence produced at trial. When no evidence is presented at

trial in support of a particular count or cause of action, courts generally conclude that the cause

of action has been waived or abandoned. *U.S. v. Kapp,* F.3d 666, 673 (7th Cir. 2005); *In re

Heritage Organization, L.L.C.,* 466 B.R. 862, 881 (Bankr. N.D. Tex. 2012). While CHAT may

not have formally waived Count Five, it effectively abandoned that cause of action by failing to

offer evidence to prove it.

35

In paragraph 77 of the complaint, which is the last paragraph of Count Five, CHAT

states as follows: "Therefore, Plaintiff asserts that its debt contained and summarized in Claim

#9 (Exhibits F and G) be declared non-dischargeable pursuant to 11 U.S.C. §523(a)(4), or in the

alternative that this issue be reserved for findings of fact in the appropriate court after further

order of this Court." CHAT's assertion in paragraph 77 of the alternative that the cause of action

set forth in Count Five might be "reserved for findings of fact in the appropriate court after

further order of this Court," was never raised or addressed by CHAT in any other pleading or at

any pretrial hearing, and was not raised by the Plaintiff at trial or at any time since. This Court

has not entered any order granting such relief or otherwise addressing the issue in any way.

When the case came before the Court for trial on July 10, 2018, the entirety of the adversary

complaint was called for trial. This Court never granted the alternative relief stated in paragraph

77 of the adversary complaint and will not do so now. By not raising that issue before trial,

CHAT waived any opportunity to have the Court consider it.

Moreover, that alternative relief could never have been properly granted given what

occurred here. CHAT filed its adversary complaint on the day of the deadline for doing so.

Lewis, Baker, Midwest Bridge and Whispering Brook did not file an adversary complaint, yet

they are the parties that asserted the breach of fiduciary duty claims against the Debtor in a

prepetition state court lawsuit. A necessary precondition to granting relief from the automatic

stay to permit a creditor's prepetition lawsuit against a debtor to proceed during a bankruptcy

case, so as to establish the facts for the purposes of issue preclusion, is that the creditor must

have timely filed an adversary complaint seeking nondischargeability of the same debt. This

Court would not have modified the automatic stay to permit the Alabama or Illinois litigation to

proceed since CHAT, the sole plaintiff here, was not a party to those actions. Even if CHAT was

contemplating filing an original action against the Debtor for breach of fiduciary duties,

assuming it would not have been time-barred under applicable limitations periods, that

possibility was waived when the case was tried without CHAT having previously moved for

relief from the automatic stay to file such a lawsuit. In effect, CHAT irrevocably selected its

forum of choice by proceeding to trial in this Court without first asking the Court to address the

stated alternative.

**Count Four:  §523(a)(2)(B)**

Count Four of the complaint is another one of the counts that CHAT advised the Court it

was not focusing on but yet was not waiving. Section 523(a)(2)(B) excepts from discharge any

debt for an extension of credit to the extent obtained by a debtor's use of a false financial

statement. The debt that is the subject of Count Four is the loan made by U.S. Bank to A Team

and personally guaranteed by Lewis and the Debtor, that was reduced to a judgment in favor of

U.S. Bank against A Team and the guarantors, which judgment was subsequently purchased by

and assigned to CHAT. Section 523(a)(2)(B) permits an assignee to stand in the shoes of its

assignor and to pursue an exception to discharge based on the assignor's reliance on a materially

false financial statement. *In re Pazdzierz,* 718 F.3d 582 (6th Cir. 2013); *In re Boyajian*, 564 F.3d

1088 (9th Cir. 2009). In order to prevail, the assignee is required to prove all of the same facts

that the assignor would have to prove if the cause of action was brought by the assignor,

including that the financial statement was materially false, that the original lender reasonably

relied upon the financial statement when making the loan, and that the debtor published the

financial statement with the intent to deceive the lender.

The personal financial statement of Mr. and Mrs. Bradley E. Stevens, dated September

18, 2012, was admitted into evidence at trial as Exhibit 11. The Debtor was the only witness

called by CHAT at trial. No one from testified for U.S. Bank. CHAT failed to introduce any evidence of reasonable reliance on the part of U.S. Bank, the original lender, and its claim under Count Four must therefore fail. Effectively, based upon the same reasoning discussed earlier, CHAT abandoned Count Four by failing to offer evidence to prove it.

It is apparent that many of the allegations made by CHAT regarding the Debtor's assets at the time of bankruptcy, may be traced back to the information the Debtor and Mary included on their personal financial statement submitted to U.S. Bank. The statement, however, was prepared more than four years before the bankruptcy was filed and reflects the state of the joint financial affairs of the Debtor and his wife. The statement predates four significant events that dramatically altered the Debtor's individual financial position in a negative way: (1) the purchase of the Alabama mine, (2) the failed attempt to buy out Lewis's interest in the mine, (3) the cessation of A Team's mining operation, and (4) the Debtor's divorce and related property settlement with Mary. While the use of the financial statement as a starting point for inquiring about the Debtor's current assets was appropriate, any attempt to use the 2012 financial statement to cast aspersions on the Debtor's credibility with respect to his bankruptcy schedules filed in April 2017, rings hollow because it does not reflect the state of the Debtor's financial affairs at or anywhere close to the date of filing.

To reiterate, having carefully observed the Debtor during his testimony at trial, the Court found the Debtor to be credible, albeit contentious at times with CHAT's attorney, which is not unexpected given the history of the bitter and ongoing litigation between the Debtor and Lewis and other parties related to the Alabama mine. The Court remains unpersuaded that the Debtor's failure to fully disclose all requested information on the petition and schedules at the time of the filing, was made with the intent to deceive. Given the amendments to the schedules and SOFA,

38

his testimony at the meeting of creditors and at trial, the Court is not persuaded that the Debtor was attempting to hide assets or otherwise hinder the Trustee or CHAT.

Finally, the Court also finds no merit in CHAT's argument that the Debtor should be held to a higher standard as a sophisticated business person. While the Debtor has owned and operated a number of businesses during his life, he did not appear to be a highly educated person. The impression he made on the Court is of someone who is always looking for the next big opportunity, without having much ability or interest in the details of business planning, financial accounting, and protecting himself contractually through the appropriate use of knowledgeable and experienced transactional attorneys. For example, the evidence indicated that he naively gave Lewis $605,000, on a hand-shake type deal with a delayed closing, without contractually obligating Lewis to return the funds if the deal didn't close.

The Debtor is entitled to Judgment on all six counts of the adversary complaint.

This Decision constitutes this Court's findings of fact and conclusions of law made pursuant to Rule 7052. A separate judgment order will be entered.


# # #